UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCOTT SMITH<br>Plaintiff, | )<br>)<br>) | Civil Action No. 22-10219 |
| V. | )<br>) | Leave to File Granted on 3/30/22 |
| APHEX BIOCLEANSE SYSTEMS, INC.,<br>DAVID R. OLUND, and<br>CHARLES RAGLAND<br>Defendants. | )<br>)<br>)<br>)<br>) | |

PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
THE REPLY OF DEFENDANT, DAVID R. OLUND

Plaintiff, Scott Smith ("Smith"), hereby sur-replies in opposition to the reply brief filed by defendant, David R. Olund ("Olund") as supplemental support for his motion to dismiss. As grounds therefore, Smith states the following:

OPERATIVE FACTS

***G.L. c. 223A, § 3(a) and Due Process Clause of the Fourteenth Amendment:***

1. Defendants' conduct occurred in the context of an employment relationship and three employment contracts (one written). Aff. Smith (¶¶ 1-2) Doc. No. 11-1 at 1; Employment Contract, Doc. No. 4-2 at 2.

2. The written employment contract between Aphex and Smith were negotiated, drafted, and signed, in part, in Massachusetts. Affidavit of Smith dated March 31, 2022 ("Aff. Smith (sur-reply)," ¶ 1.

3. The alleged breach of Smith's employment agreements occurred in Massachusetts and caused damages in Massachusetts via non-payment of Smith's wages and non-payment of taxes to the Commonwealth. Aff. Smith (sur-reply), ¶ 4; Aff. Ragland (¶ 7), Doc. No. 21-1 at 4.

4. Aphex recruited and retained a Massachusetts-based employee.

5. Aphex expected and intended for Smith to work out of his home in Massachusetts. Aff. Smith (¶ 11), Doc. No. 11-1 at 2; Aff. Smith (sur-reply), ¶¶ 4, 8-9; Affidavit of David J. Weaver dated, March 30, 2022 ("Aff. Weaver"), ¶¶ 3-9, 12, 14-15.

6. Smith was employed as a high-level agent and executive of Aphex, i.e., as officer and director of Aphex. Aff. Smith (¶¶ 1-2), Doc. No. 11-1 at 1.

7. Aphex expected, desired, directed, intended, and financially supported Smith to transact business in Massachusetts on behalf of Aphex. Aff. Smith (¶¶ 11-19), Doc. No. 11-1 at 2; Aff. Smith (sur-reply), ¶¶ 5, 7, 9-13; Aff. Weaver, ¶¶ 10-13.

8. Aphex transacted business in Massachusetts. Aff. Smith (¶¶ 12-14, 17), Doc. No. 11-1 at 2-3; Aff. Smith (sur-reply), ¶¶ 6-7, 9, 11-13; Aff. Weaver, ¶¶ 10-13.

9. Aphex provided Smith with product inventory, supplies and equipment to work on and operate Aphex business out of his home in Massachusetts, and to transact business in Massachusetts on behalf of Aphex, by authorizing Smith to purchase and use the same and to submit same for reimbursement. Aff. Smith (¶¶ 13, 18-19), Doc. No. 11-1 at 2-3; Aff. Smith (sur-reply), ¶¶ 5-6, 9-13; Aff. Weaver, ¶ 13.

*G.L. c. 223A, § 3(e) and Fourteenth Amendment:*

10. Aphex used real property in Massachusetts (i.e., Smith's home and his garage), as its packing and storage facility for product inventory that was sent and received, internally, between Aphex facilities in MA, NY, and FL, and as a base from which to mail product samples to potential customers of Aphex. Aff. Smith (sur-reply), ¶¶ 5, 9-13.

*G.L. c. 223A, § 3(c) and (d):*

11. Aphex, Olund, and Ragland caused tortious injury by retaliatory filings in the U.S. District Court of Massachusetts for no other purpose than to penalize Smith for petitioning this Court for redress under the Massachusetts Wage Act. *See,* Olund's Motion to Dismiss (Ex. B), Doc. No. 8-4 at 2; Ragland's Motion to Dismiss (Ex. B), Doc. No. 10-2 at 2.

12. Aphex caused tortious injury in Massachusetts by retaliatory acts outside of Massachusetts, such as issuing false and negative press releases about Smith, conducting special board meetings to terminate Smith from the board of directors, removing Smith from the board of directors, and bad-mouthing Smith to other shareholders and investors of Aphex. Aff. Smith (¶ 9), Doc. No. 11-1 at 2; First Amended Complaint, Doc. No. 4 at 6-8; Aff. Smith (sur-reply), ¶¶ 14-16.

## REPLY ARGUMENT

### A. *Prima Facie* Showing of Personal Jurisdiction.

"The most commonly used method of determining a motion to dismiss for want of personal jurisdiction is for the district court to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction. To defeat a motion to dismiss when the court uses this method the plaintiff must make the showing as to every fact required to satisfy "both the forum's long-arm statute and the due process clause of the Constitution." Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992), *quoting,* U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11 (1st Cir. 1990). Here, Olund's brief ignores the prima facie standard and presents the frivolous, if not obscure, defense that Smith was somehow attempting to amend his complaint by affidavit, and that he was required to allege sufficient facts in his complaint to show personal jurisdiction. *See,* Olund's

Reply, Doc. No. 13 (passim). Aside from the fact that Smith's complaint alleged sufficient facts to support personal jurisdiction over Aphex and, via the Massachusetts Wage Act, over its president and treasurer,[1] Smith is not limited to the four corners of his complaint. Ibid.

In the context of a breach of contract, courts take a practical approach when evaluating "minimum contacts" that includes performance and the parties' actual course of conduct.

> The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, *International Shoe Co. v. Washington, supra*, at 319, or on "conceptualistic . . . theories of the place of contracting or of performance," *Hoopeston Canning Co. v. Cullen*, 318 U.S., at 316. Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.*, at 316-317. It is these factors -- prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing -- that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478-479 (1985). Olund's reply argues against Aphex having ""minimal" contacts" in Massachusetts. Doc. No. 13 at 1. But the stubborn facts are that the written employment contract was negotiated, drafted, and signed, at least in part, in Massachusetts (Operative Facts ("OF") ¶ 2), breach of the agreement occurred in Massachusetts and caused damage in Massachusetts (OF ¶ 3), Aphex recruited a Massachusetts-based employee to work primarily out of his home in Massachusetts (OF ¶¶ 4-5), Aphex maintained a home office (residential) in Massachusetts where Aphex officers and one director, in fact, regularly worked in Massachusetts, i.e., Smith at his home, as a member of Aphex's board of directors, its CSO and its CMO (OF ¶¶ 5-6), Aphex transacted business in Massachusetts (OF ¶¶ 7-9), and used real property in Massachusetts to store product inventory, to transfer inventory between

---

[1] "the president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section." M.G.L. c. 149, s. 148. Thus, as the president of Aphex, Olund is treated as the employer for all purposes, including personal jurisdiction.

Aphex facilities, and to pack and ship product samples to potential customers and business partners of Aphex (OF ¶ 10). The suggestion that a supervisor of Smith was required to be in-state (Doc. No. 13 at 2-3) is without merit where, here, Smith was a high-level executive.[2] OF ¶ 6. Olund overlooks the fact that Smith was a high-level agent of Aphex such that his acts were the acts of Aphex for purposes of establishing personal jurisdiction (purposeful availment) over Aphex.[3] The case of Stanton v. Lighthouse Fin. Servs., lends some context to this dynamic where this Court upheld a Wage Act violation claim by a company president who brought a suit for unpaid wages against defendants, the startup he founded, and its CEO. 621 F. Supp. 2d 5, 7 (D. Mass. 2009). Olund (and Flynn) play semantics while misapprehending a meaningful distinction between an employer who "requires" and one who "understands" the location where an employee will be working and soliciting business. The fact of notice is all that is required to place an employer on fair notice that it may be hailed into court in that jurisdiction. World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Here, the operative facts satisfy every adjective to describe that Aphex purposefully availed itself of the Commonwealth, and neither required Smith to work elsewhere nor could it have afforded to pay for such an accommodation. OF ¶¶ 5, 9-10. Thus, what Olund and Flynn characterize as "fortuitous" (Doc. No. 13 at 4) was, in fact, a necessity, and Aphex *required* Smith to work from his home in Massachusetts, out of financial necessity, as a condition of Smith's employment. OF ¶¶ 5, 9-10. Olund misrepresents and conceals evidence from this Court, knowing full well that all Aphex employees work from

---

[2] M.G.L. c. 149, § 148, is not limited to low-level employees. Stanton v. Lighthouse Fin. Servs., 621 F. Supp. 2d 5, 2009 U.S. Dist. LEXIS 34813 (D. Mass. 2009); Okerman v. VA Software Corp., 69 Mass. App. Ct. 771, 871 (2007).

[3] "A court may exercise personal jurisdiction over a person, who acts directly **or by an agent**, as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth." M.G.L. c. 223A, § 3(a).

home. Id. Exceptions are where a few, work-from-home employees also go to an office location in upstate New York or a factory in Florida. Id. Specifically, Olund, Ragland, and chairman, Thomas Fitzgerald, work out of their homes. Id.

Olund continues to argue the merits of Smith's claims rather than the issue of jurisdiction. The assertion that an employment contract can be void *ab initio* remains frivolous and is irrelevant to the question of jurisdiction. Smith need only satisfy the definition of an "employee" under the Wage Act, which does not even require there to be a written agreement. M.G.L. c. 149, s. 148.

### B. Olund's False Affidavit Obfuscates Material Facts to Obtain a Judgment.

Olund frivolously challenges the form of Smith's affidavit as deficient by fraudulently misrepresenting to this Court that Smith's affidavit was unsigned. Doc. No. 13 at 1. Smith signed his affidavit and has been habitually serving the defendants, by mail, copies of his filings *as docketed* with the CM/ECF generated headings. *See,* Affidavit of Scott Smith, Doc. No. 9-1 at 3.

Olund fraudulently and deceptively purports to quote from Smith's affidavit that he used a "travel computer." Doc. No. 13 at 2. This dishonest obfuscation was an attempt to refute Smith's location within Massachusetts while working for Aphex, including attending board meetings via Zoom and communicating by email with his employer. Smith made no such statement and the purported quote, "travel computer," does not exist in Smith's affidavit. Doc. No. 9-1 at 2-3.

Olund employs Flynn folly to suggest that the written employment agreement somehow called for Smith to work in Nevada so that he could be supervised by a Nevada corporation. "The implication is that he will be "very close to the flagpole"—a flagpole not located in Massachusetts." Doc. No. 13 at 1. This foolish argument is contradicted by Olund's affidavit, wherein he states the intention was for Smith to work in the "Middle East" in one breath, and

that Aphex "did not intend or require the CMO to work from any location" in another. Aff. Olund (Ex. A), Doc. No. 13 at 2-3. Worse yet, co-defendant, Ragland, argued that Smith was supposed to work in New York. *See,* Ragland's Reply, Doc. No. 21 at 3. Moreover, Ragland swore under oath, in Paragraph 4 of his affidavit, that because Smith was Aphex's international traveler for its worldwide marketing "[i]t would obviously never be expected that this role could be accomplished solely or principally from [being "close to the flagpole" within the U.S.]." *See,* Aff. Ragland, Doc. No. 21-1 at 3.

Notably absent from Olund's reply are any communications from the employer, Aphex, objecting to Smith working out of his home in Massachusetts, reprimanding Smith for failing to show up for work at some out-of-state location, directing Smith to travel to the Middle East (Smith never traveled to the Middle East) or abroad (Smith never traveled abroad for Aphex), and Olund fails to produce any receipts for international travel expenses (plane tickets, rental cars, lodging, etc.). To the contrary, evidence shows that Aphex could not even afford to pay Smith's expenses incurred within Massachusetts and within the United States, let alone, to be able to fund international travel. OF ¶¶ 5, 9-10. Nor does his Reply claim or show where Smith was ever notified that Aphex is not licensed to do business in Massachusetts, or instructing Smith to refrain from doing business in Massachusetts or obtaining contracts with Massachusetts customers.

To the contrary, all the defendants, Aphex, Olund, and Ragland, directed, assisted, supported, and applauded Smith for doing business in Massachusetts. Smith was told that Aphex tried for a decade but failed to obtain a contract with a municipality, while Smith accomplished this amazing feat after only a few months on the job, and Olund was on most of the emails pertaining to Smith's work on Martha's Vineyard. Aff. Smith (Exs. 2, 3), Doc. No. 11-1, at 9, 11.

Therefore, Ragland was aware that Aphex expected, intended, supported and directed Smith to conduct business within Massachusetts, and was specifically aware of such efforts in Tisbury, MA and a customer contact in Gloucester, MA.

**1. False Swearing and Fraudulent Misrepresentations to the Court.**

An example of a fraud upon the court has been found "where a litigant fabricated e-mail and submitted false affidavits then maintained an "additional charade, attempting to hide the fabrication,"" Household Fin. Corp. II v. Matthews, 2013 Mass. App. Div. LEXIS 36, *8, *quoting*, Munshani v. Signal Lake Venture Fund II, LP, 60 Mass. App. Ct. 714, 719 (2004).

Here, Olund did not falsify a document, but he misrepresented to this Court that the written employment agreement with Smith pertained to the chief marketing officer ("CMO") position. *See,* Aff. Olund, Doc. No. 13-1 at 2-3. Olund swore that he was "totally familiar with all events surrounding the involvement of Scott Smith with the Company." Doc. No. 13-1 at 2. And stated, "I have reviewed paragraph numbered 11. Of Mr. Smith's March 14, 2022, "Affidavit" and find It to be totally false and perjurious, as any Aphex employee or Director could corroborate, in terms of the CMO position contemplated by Aphex." Id. at 3. Building upon the obfuscation of this false premise, Olund goes on to extol Aphex's worldwide marketing plans and how its aspirations of worldwide activity, would involve heavy international travel, which is the farthest thing from Aphex expecting Smith to work from his home in Massachusetts. Specifically, Olund swore that:

> Mr. Weaver was anxious to fill the position of Chief Marketing Officer (CMO) and determined to prepare a contract for his engagement in that capacity. The CMO position was contemplated to be one requiring worldwide activity, with special emphasis on the Middle East, and was also contemplated to have a heavy international focus. Because of this it made no difference where the CMO was physically located, and the Company did not intend to require the CMO to work from any location.
> …

>  Mr. Weaver was not a lawyer, but the June 1, 2021, document he drafted did reflect the requirements the Company had hoped for concerning the CMO.

Doc. No. 13-1 at 2-3. Back to reality, Smith's written employment agreement had nothing to do with Aphex's marketing plans or the CMO position. FAC (Ex. 2), Doc. No. 4-2. In truth, David Weaver, as CEO of Aphex, never had any discussions involving Olund, Ragland, or anyone else about hiring Smith as Aphex's CMO, and never considered Smith for the CMO position. *See,* Aff. Weaver, ¶¶ 16-17. Aphex couldn't even afford to pay Smith's expenses within Massachusetts and the United States, let alone, fund a prolonged campaign of international travel. FAC (pars. 33-40), Doc. No. 4 at 3-4; Aff. Weaver, ¶ 14. In fact, Aphex had no travel requirements at all for Smith. Aff. Weaver, ¶ 17. Regardless of whether the obfuscation and misrepresentation of material facts by Olund's affidavit rises to the level of a fraud upon the court, it nevertheless, constitutes a false sworn statement that frustrates the administration of justice.

Olund swore falsely to this Court and concealed evidence that all employees of Aphex work from home and that no employees of Aphex, including prior CMO's of Aphex, have ever traveled to or worked in the Middle East. Aff. Weaver, ¶ 18; Aff. Smith (sur-reply), ¶ 8. Noticeably absent from Olund's reply are any documented communications that anyone from Aphex should travel or have ever traveled to the Middle East. Rather, evidence shows Aphex could not even afford to pay Smith's expenses incurred in Massachusetts and within the United States, let alone, to be able to fund international travel. FAC (pars. 33-40), Doc. No. 4 at 3-4; Aff. Weaver, ¶ 14.

Olund swore falsely to this Court and concealed evidence of the fact that, in or around December 2021, Olund had directed Smith to go on a sales call within Massachusetts and was making arrangements for Smith to meet in Massachusetts with another company's CEO, who lived in Gloucester, MA, about becoming a customer of Aphex. OF ¶¶ 7-8 (Aff. Smith (sur-reply), ¶ 7).

Given these facts, and whereas Olund knew and worked with this CEO, the Court can infer that Olund had been placing phone calls into Massachusetts and/or writing emails to this other company's CEO in Massachusetts. Regardless of whether, standing alone, phone calls are conclusive of jurisdiction,[4] they illustrate the intent and expectation of Aphex to conduct business in Massachusetts and, taken together with the totality of facts herein, establish "minimum contacts" and fair notice that Aphex may be hailed into a Massachusetts court.

Olund swore falsely to this Court and concealed evidence of the fact that Aphex used real estate in Massachusetts (Smith's home and garage) as its packing, shipping, and inventory storage facility. OF ¶ 10. On August 13, 2021, defendant, Olund, sent Smith an email to pack and ship Aphex product samples from Smith's home in Massachusetts—where it was known to Olund that Aphex stored and shipped its inventory in and from Massachusetts—to a potential customer/business partner. *See,* Aff. Smith (sur-reply), ¶ 13.

Therefore, Olund was aware that Aphex expected, intended, supported and directed Smith to work, transact, and conduct business within Massachusetts, and was specifically aware of such efforts in Tisbury, MA and a customer contact in Gloucester, MA, and specifically aware of Aphex's use of Smith's home and garage as its packing, shipping and inventory storage facility.

C.     **Personal Jurisdiction via Long-Arm and Minimum Contacts**

---

[4] "For instance, in *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 256 N.E.2d 506, 508, 308 N.Y.S.2d 337 (N.Y. 1970), the New York Court of Appeals found a defendant's phone calls into New York for the purpose of participating in an auction (i.e., for the purpose of entering into a contractual or business relationship) sufficient to establish personal jurisdiction under § 302(a)(1). When, however, the correspondence with New York is made for the purpose of carrying out duties pursuant to a contract formed elsewhere, and not to transact business in New York, such correspondence will not establish personal jurisdiction under New York's long-arm statute. *See Roper Starch Worldwide*, 2 F. Supp. 2d at 474."
In re Banco Santander Sec.-Optimal Litig., 732 F. Supp. 2d 1305, 1322 (S.D. Fla. 2010).

Aphex, Olund and Ragland are subject to personal jurisdiction pursuant to G.L. c. 223A, § 3(c) for having committed tortious conduct within Massachusetts. OF ¶ 11. Independent of all prior events, this Court obtained personal jurisdiction over defendants, Olund and Ragland, when they willingly and purposefully used this Massachusetts forum as a platform for their retaliatory conduct against Smith, in violation of Section 148A of the Wage Act, by filing a defamatory article about Smith as an exhibit to their motions to dismiss. OF ¶ 11. (Doc. No. 8-4 at 2; Doc. No. 10-2 at 2). Here, they violated Massachusetts law, within Massachusetts, and used this Court to commit both civil violations and a prima facie crime. See, M.G.L. c. 149, §§ 27C, 148A.[5] To the extent needed to establish personal jurisdiction, this Court should grant leave of Smith to amend his complaint to include these latest transgressions.

Aphex, Olund and Ragland are similarly subject to personal jurisdiction pursuant to G.L. c. 223A, § 3(d) for having caused tortious harm in Massachusetts by acts committed outside of Massachusetts. OF ¶ 12.

Reference to the notice provision in the written employment contract contributes nothing to the equation because it was contradicted by Paragraph 1 of the agreement:

> The Corporation hereby employs the Chief Sustainability Officer for the Corporation. The Executive shall report to and take direction from the Chief Executive Officer, and/or the Board of Directors of the Corporation, as represented by the Chairman thereof (the "Chairman").

FAC (Ex. 2), Doc. No. 4-2 at 2. Moreover, it pertained only to the CSO position and Smith later became the very body he was to report to, i.e., a board director. At best, the notice provision would

---

[5] The Massachusetts Wage Act provides criminal and civil remedies for violations (M.G.L. c. 149, § 148A); G. L. c. 149, § 27C (authorizing various penalties, including fines, imprisonment, and civil penalties). Patel v. 7-Eleven, Inc.; DP Milk St. Inc., No. SJC-13166, 2022 Mass. LEXIS 146, at *8.

only have been intended for legal notices and not for communications in the ordinary course of Smith's employment.

In sum, defendants conceal, misrepresent, and misapprehend the operative facts of this case. Aphex knew and intended for Smith to work in Massachusetts by employing a Massachusetts resident and there being no other location provided to work, and no other information, direction, or evidence that Smith was to work anywhere else. OF ¶¶ 4-5. The Affidavit of Weaver confirms his intention for Smith to work from his home in Massachusetts. Aff. Weaver, ¶ 5. Aphex contemplated, encouraged, supported, and expected Smith to conduct business in Massachusetts on behalf of Aphex. OF ¶¶ 7-10. The use of Smith's home and garage as Aphex's packing, shipping and storage facilities in Massachusetts further satisfies G.L. c. 223A, § 3(e) of the Massachusetts long-arm statute. OF ¶10. In addition to communications Smith had with Aphex's highest level executives, Smith himself, as an agent of the employer, was an officer and director of Aphex engaging in such work. OF ¶ 6. Contrary to the false affidavits of Olund and Ragland, Aphex knowingly and purposefully availed itself of the Commonwealth's commerce and services, and treated itself as a Massachusetts employer, including, without limitation, by paying MAPFL and MAPML taxes[6] on those portions of Smith's wages that were paid. OF ¶ 5; Aff. Smith (sur-reply), ¶ 17.

Aphex desired, directed, intended, assisted, supported, and commended Smith for doing business in Massachusetts on behalf of Aphex and Olund directed Smith to go on a sales calls within Massachusetts and made arrangements for Smith to meet with another

---

[6] MAPFL is Massachusetts Paid Family Leave. MAPML is Massachusetts Paid Medical Leave.

company's CEO, who lived in Gloucester, MA, about becoming a customer of Aphex. Aff. Smith (sur-reply), ¶ 13. (discussed, *supra.*)

      WHEREFORE, the plaintiff, Scott Smith, prays this Court to deny the defendant, Olund's, motion to dismiss; and to the extent necessary to establish personal jurisdiction, grant leave for Smith to amend his complaint to include recent violations committed in this Court by his Ex. B filing (Doc. No. 10-2 at 2) and to fashion such further orders as justice warrants.

Date:   April 1, 2022

Respectfully submitted,
Scott Smith, plaintiff
By his attorney,
/s/Brian J. Wasser
Brian J. Wasser, BBO #633621
REALTYESQUIRE, PC
P.O. Box 151
W. Hyannisport, MA 02672
(508) 862-9999
lawclaims@msn.com

Certificate of Service
I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non registered participants on April 2, 2022.