# AFFIDAVIT OF DAVID WEAVER

I, David Weaver, under the pains and penalties of perjury, hereby certify, on the basis of personal knowledge, that the following statements are true:

1. I was employed by Sunset Capital Inc. ("Sunset") as its Pres/CEO from 07/31/2020 to 08/10/2021, and Aphex BioCleanse Solutions, inc. ("Aphex") as its Pres/CEO from 10/25/2011 to 08/10/2021. Part of my job at Aphex included creation of Marketing and Sales Plans as well as managing day-to-day operations including Regulatory activities.

2. On or about June 9, 2021, I executed an Employment Contract with Scott Smith to serve as Aphex Chief Sustainability Officer and separately, an Assignment and Transfer Agreement with Scott Smith/AquaFlex Holdings LLC and Scott Smith/US BioSolutions LCC. Along with the approval of Aphex 's board of directors, I had the authority as President/CEO of Aphex to execute these agreements. (hereinafter referred to as "Subject Agreements"). The Subject Agreements are compiled and attached hereto as "Exhibit 1."

3. During my conversation with Scott Smith regarding the final agreement, there was no requirement for him to relocate from his residence to either the corporate office in Pittsford, NY or the factory in Port Richey, Florida.

4. As the payroll officer, I required Scott Smith to send me his W-2 that included his social security number as well as his current address and deductions.

5. I made several calls to Paychex to obtain the correct paperwork from Massachusetts to be filed for the state taxes that Scott Smith owed. This was challenging because Paychex offered little direction on where to find those documents. Obviously, I was well aware that Scott Smith was working from his home in Massachusetts and that is what I had intended and expected him to do.

6. During my employment, David Olund worked from his residence in Florida and seldom traveled to the corporate office (once) or the factory (twice).

7. During my employment, I never met Chuck Ragland personally and he never traveled to the corporate office or the factory. All communications were either by phone, email or zoom calls.

8. During my employment, Anthony Marotti who lives less than 10 miles from the corporate office worked from his residence. He would stop by the office seldom if ever and refused to participate visually on any Zoom call.

9. During my employment, Scott and Becky Buckley worked both at the factory in Florida as well as their residence. They participated via Zoom on weekly marketing meetings or by phone and email.

*[Signature]* 3/30/2022

10. I, on behalf of Aphex, had every intention and desire for Smith to conduct business in Massachusetts on behalf of Aphex, and anywhere else where Smith had developed contacts, connections, and relationships.

11. I, on behalf of Aphex, fully understood that most of Smith's contacts and relationships were likely to be within Massachusetts, and hoped to be able to tap into the Massachusetts market to establish business relationships for Aphex within Massachusetts via Smith.

12. The added appeal for Aphex to do business in Massachusetts was having Smith working and residing there such that any travel needs could be performed less expensively and any customer support needs could be directed to Smith and could be attended to more personally, rapidly, and reliably with Smith as our local contact.

13. One of the first requests from Scott Smith that was in harmony with my hopes and expectations for Smith to attract business in Massachusetts, was an approval from me, that I eagerly gave, as the President and CEO of Aphex, to travel from his residence to Martha Vineyards on a special project to help manage the waste-water treatment problems in Tisbury, MA. Scott Smith requested approval for the travel expenses related to Tisbury, MA. He was paid promptly by me after turning in the required paperwork.

14. At no time did Scott Smith fail to communicate his intentions to travel from his residence to work sites, conventions or meetings without my knowledge and prior approval. Not every request was approved based on the financial conditions of the corporation.

15. There was no requirement by me that Scott Smith travel for the corporation as the CSO.

16. I never had any discussions with David Olund, Charles Ragland, or anyone about hiring Scott Smith to serve as Aphex's chief marketing officer ("CMO").

17. I never considered hiring Scott Smith as Aphex's CMO.

18. Mark Timm, as Aphex's CMO, traveled, on one occasion, by personal plane from his residence in Indiana to the corporate office for a Board Meeting in April, 2021. His title as CMO was suggested by David Olund to "impress the shareholders." The Board never expected Mark Timm to offer, create or suggest any marketing opportunities for the Corporation. He did hold weekly marketing meetings via Zoom where Mark Washo presented the current sales opportunities.

19. The Employment Agreement for Scott Smith was reviewed by Robert J Flynn in his role as the corporate attorney. Smith's Agreement was identical in all aspects to the general one used for every employee, including mine, except for the yearly salary and employee location.

*[signature]* 3/30/2022

20. Don Henshaw contends in his 1/16/2022 email to Brian Wasser that the Scott Smith contract was drafted by David Weaver falsely represents the facts. These Aphex contracts were written by an attorney in 2011 at my request as Pres/CEO.

SINGED THIS 30TH DAY OF MARCH 2022

*David J. Weaver*
DAVID J. WEAVER

# EXHIBIT 1

# EMPLOYMENT AGREEMENT

THIS AGREEMENT made this 1st day of June, 2021

BETWEEN:

Aphex BioCleanse Systems, Inc., a corporation incorporated

under the laws of Nevada, USA

(herein called the "Corporation")

**OF THE FIRST PART**

-and -

Scott Smith, of the State of Massachusetts, USA

(herein called the "Executive")

**OF THE SECOND PART**

WHEREAS the Corporation carries on the business of developing, manufacturing, marketing and selling chemical products, that require technical and management assistance (the "Business");

AND WHEREAS the Corporation has agreed to employ the Executive in the Business and the Executive has agreed to accept such employment, subject to the terms, conditions and covenants herein provided;

NOW THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration (the receipt and sufficiency whereof are hereby acknowledged), the Corporation and the Executive hereby agree be employed by the Corporation with the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. The Corporation hereby employs the Chief Sustainability Officer for the Corporation. The Executive shall report to and take direction from the Chief Executive Officer, and/or the Board of Directors of the Corporation, as represented by the Chairman thereof (the "Chairman").

2. Through the term of this Agreement, including any renewals hereof, the Executive shall be required to devote the whole of his time and attention to the business and affairs of the Corporation, and shall advise the Corporation in writing of any other business or occupation or become an employee or agent of any other corporation, firm or individual; provided that nothing herein shall be construed so as to prevent the Executive from making investments of a strictly passive nature, so long as such investments, when considered together, are not of a type or in an amount as would conflict with the efficient performance by the Executive of his duties hereunder.

1

Int _DW_   Int _SS_

# EMPLOYMENT AGREEMENT

3. The Corporation shall employ the Executive at an annual salary of **$144,000.00** (such salary referred to herein as the "Base Salary"), payable periodically in accordance with Corporation's practice (net of applicable deductions and required withholdings). The performance of the Executive will be reviewed annually by the Board of Directors and the Chief Executive Officer, and in the discretion of the Board of Directors and the Chief Executive Officer, the Base Salary of the Executive may be increased; provided, however, the Board of Directors and the Chief Executive Officer shall be under no obligation to increase the Base Salary at the time of any such review.

4. The Executive will also be eligible for incentive compensation, to be based on corporate and individual performance, to be awarded in the sole discretion of the Board of Directors and the Chairman. Incentive compensation may be in the form of performance based cash bonuses and/or mid and long term share based compensation, such as restricted, or non-restricted share/units, options and share appreciation rights. Such equity participation may be in the form of equity of the Corporation and/or equity in the capital stock of client companies. In addition, the Executive shall receive a performance payment based upon the company's revenue levels as compared to annual set target(s).

5. The Executive shall be entitled to participate in all benefit and pension programs offered by the Corporation to senior employees at the level of the Executive as such plans may be amended by the Corporation from time to time. If part of the said benefit program consists of the provision of insurance for the Executive and/or his estate, the Executive agrees to provide necessary medical information and to undergo such medical examinations as may be reasonably requested by insurance carriers in this regard.

6. The Corporation shall pay all expenses actually and properly incurred and vouchered by the Executive in furtherance of the Business of the Corporation, in accordance with Corporation's policies. If any such expenses are paid in the first instance by the Executive, the Corporation shall reimburse him therefor, subject to the receipt by the Corporation of statements and vouchers in form reasonably satisfactory to it.

7. The Executive shall be entitled to an annual vacation of four (4) weeks in each calendar year. Such vacations may be taken only at such times as the Executive and the Corporation may from time to time reasonably determine having regard to the operations of the Corporation.

8. The Executive's employment shall be for a Term of One Year, renewable on the anniversary of the signing of this Agreement, provided neither party had given Sixty (60) Days notice of termination. This agreement is subject to termination in accordance with the terms of this Agreement.

9. The Corporation may terminate the employment of the Executive forthwith, without advance notice and without pay in lieu of notice, for Cause (as defined below). For the purposes of this Agreement, "Cause" shall mean:

2

Int _DW_  Int _SS_

# EMPLOYMENT AGREEMENT

   a) the failure or refusal of the Executive to perform his material duties and responsibilities hereunder;
   b) any dishonesty on the part of the Executive affecting the Corporation;
   c) the conviction of the Executive for an indictable offense or for any crime involving moral turpitude, fraud or misrepresentation;
   d) any willful and intentional act on the part of the Executive having the effect of materially injuring the reputation, business or business relationships of the Corporation;
   e) any material breach of any of the provisions of this Agreement; and
   f) any other act or omission which would constitute Cause as such term is construed by the courts of Florida, USA.

10. Subject to the provisions of paragraph 12 hereof, the Corporation may terminate the employment of the Executive for any reason whatsoever, by the payment of the Executive's then Base Salary (less applicable deductions and required withholdings) from the date of termination of his employment until the expiry of Six months from the date of termination, provided that if the Executive breaches the Executive's obligations set out in the attached Confidentiality, Non-Solicitation, Non-Competition and Intellectual Property Agreement, the Corporation's obligations to continue the Executive's Base Salary as set out herein shall immediately terminate, without prejudice to the Corporation's other rights to enforce the provisions of such agreement(s). The benefits to be provided to the Executive pursuant to paragraph 5 hereof shall continue to be maintained during the period referred to above, provided that if any particular benefit cannot be continued during such period because of the requirements of the carrier, the Executive shall be paid the cost to the Corporation of providing such benefit. The payments and benefits set out in this section are conditional on the Executive signing a full and final release of the Corporation in a form satisfactory to the Corporation.

11. The Executive agrees to execute and be bound by the Confidentiality, Non-Solicitation, Non-Competition and Intellectual Property Agreement attached hereto.

12. This Agreement and the Confidentiality, Non-Solicitation, Non-Competition and Intellectual Property Agreement attached hereto constitute the entire agreement between the parties hereto with respect to the employment of the Executive and any and all previous agreements, written or oral, express or implied, between the parties hereto or on their behalf relating to the employment of the Executive by the Corporation are hereby terminated and canceled, and each of the parties hereto hereby releases and forever discharges the other of and from all manner of actions, causes of action, claims, demands whatsoever under or in respect of any such agreement. The Executive represents and warrants to the Corporation that in accepting employment hereunder and performing the duties and responsibilities set out herein, the Executive is not in breach of any agreements with or obligations to any third party.

13. Any notice required or permitted to be given hereunder shall be in writing and shall be effectively given if (i) delivered personally, (ii) sent by prepaid courier service or registered mail, or (iii) sent by telecopier, on any Business Day addressed, in the case of notice to the Executive, as follows:

# EMPLOYMENT AGREEMENT

Scott Smith

*and*

in the case of notice to the Corporation, addressed as:

Aphex BioCleanse Systems, Inc.
1162 Pittsford Victor Rd Ste 220,
Pittsford, NY 14534

or at such other address or telecopier number as the parties to whom such writing is to be given shall have last notified to the party giving the same in the manner provided in this section. Any notice delivered to the party to whom it is addressed as hereinbefore provided shall be deemed to have been given and received on the day it is so personally delivered at such address, or if sent by facsimile on the date it is transmitted (with confirmation of receipt). Any notice mailed as aforesaid shall be deemed to have been given and received on the 3rd business day following the date of its mailing.

14. This Agreement shall be governed by and interpreted under the laws of the **United States of America.**

15. All dollar amounts referred to in this Agreement are expressed in **US** funds unless otherwise specifically provided herein.

16. The benefits and obligations of this Agreement may not be assigned by either party to any other person; provided, however, that the Corporation may assign this Agreement to an affiliate or subsidiary of the Corporation without the consent of the Executive. Except as aforesaid, this Agreement shall endure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, including, in the case of the Executive, his heirs, executors and administrators.

17. The Executive acknowledges that (a) he has read and understood this Agreement, and (b) has had the opportunity to obtain independent legal advice in connection with this Agreement and the provisions hereof.

4

Int _DW_           Int _SS_

# EMPLOYMENT AGREEMENT

No amendment or waiver of this Agreement shall be binding unless executed in writing by the parties and no such amendment or waiver shall extend to anything other than the specific subject matter thereof the failure at any time of any party to insist on strict performance of any provision of this Agreement shall not limit the ability of that party to insist at any future time whatsoever on the performance of the same or any other provision (except insofar as that party may have given a valid and effective written waiver or release).

IN WITNESS WHEREOF the parties hereto have executed this Agreement this 1st day of June, 2021.

**Executive**

_____
Scott Smith
Chief Sustainability Officer

**Company**:
Aphex BioCleanse Systems, Inc.
A Nevada Corporation

_____ (SEAL)
David J. Weaver
President and CEO
Aphex BioCleanse Systems, Inc.

5

Int  DW                    Int  SS