UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCOTT SMITH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:22-cv-10219-IT |
| | * | |
| APHEX BIOCLEANSE SYSTEMS, INC., | * | |
| DAVID OLUND, and CHARLES | * | |
| RAGLAND, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

April 10, 2024

TALWANI, D.J.

Plaintiff Scott Smith brings this action against Defendants Aphex BioCleanse Systems, Inc. ("Aphex"), David Olund, and Charles Ragland. Pending before the court are Olund's Motion for Dismissal of the Amended Complaint ("Olund MTD") [Doc. No. 8] and Ragland's Motion for Dismissal of the Amended Complaint ("Ragland MTD") [Doc. No. 10]. For the reasons set forth below, Olund's Motion to Dismiss [Doc. No. 8] is DENIED and Ragland's Motion to Dismiss [Doc. No. 10] is GRANTED.

**I.    Procedural Background**

A.    *The Amended Complaint*

Smith initiated this action against Aphex, its President, Olund, and its Treasurer, Ragland, on February 10, 2022. Complaint [Doc. No. 1]. Smith's Amended Complaint [Doc. No. 4] alleges the following facts:

On June 1, 2021, Smith was employed by Aphex as its Chief Sustainability Officer ("CSO") pursuant to an agreement signed by Aphex's then-President and CEO, David Weaver.

Am. Compl. ¶ 8 [Doc. No. 4]; Ex. 2, CSO Employment Agreement ("CSO Agreement") at 5 [Doc. No. 4-2]. On October 1, 2021, after Olund became the President of Aphex, Smith was further employed by Aphex as its Chief Marketing Officer ("CMO") and a member of its Board of Directors (the "Board"). Id. ¶¶ 10, 13.

Olund verbally promised Smith that he would receive a salary appropriate for a CMO, as well as the standard compensation paid to all Aphex Directors. Id. Smith alleges that Aphex failed to pay him the total amount he was entitled to under his CSO Employment Agreement, failed to provide health insurance for the CSO position, failed to pay his earned wages and benefits for his CMO and Board positions, and failed to reimburse him for employment-related expenses. Id. ¶¶ 19-27.

On or about January 5, 2022, Smith filed a complaint with the Massachusetts Attorney General's Office ("AGO") alleging violations of the Wage Act by Aphex, Olund, and Ragland. Am. Compl. ¶ 6 [Doc. No. 4]. Smith states that after Aphex learned of the complaint, Olund, Ragland, and other Aphex executives instigated a "Smear Campaign" against him. Id. ¶¶ 61-65.

The Amended Complaint alleges that Defendants violated various provisions of the Massachusetts Wage Act, M. G. L. c. 149, §§ 148, 150, by failing to pay Smith the wages and benefits he earned in his positions as Chief Sustainability Officer, Chief Marketing Officer, and as a member of Aphex's Board of Directors (Count I), and by retaliating against Smith for filing a complaint of nonpayment with the Attorney General's Office ("AGO") and continuing such retaliation after Smith initiated this action (Count II). Am. Compl. ¶¶ 41-84 [Doc. No. 4]. Smith also asserts claims against Aphex for breach of contract (Count III), quantum meruit (Count IV), and promissory estoppel (Count V). Id. ¶¶ 85-103.

B.     *Olund and Ragland's Pending Motions*

Olund and Ragland responded to the Amended Complaint with the pending *pro se* Motions to Dismiss [Doc. Nos. 8, 10], which Smith opposes. Both motions seek dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), and improper venue under Fed. R. Civ. P. 12(b)(3).

C.     *Aphex and the Bankruptcy Stay*

Aphex initially appeared through counsel, who were subsequently granted leave to withdraw. See Elec. Order [Doc. No. 57]. Olund then filed a Suggestion of Bankruptcy [Doc. No. 39] giving notice that Aphex had filed a bankruptcy petition in the United States Bankruptcy Court for the Middle District of Florida. Smith filed a Notice of Fraud [Doc. No. 40] asserting that the Suggestion of Bankruptcy [Doc. No. 39] pertained to a different company and was an attempt to circumvent this court's orders and cause delay. After amended filings and motion practice in the bankruptcy proceedings, this court stayed the instant case pending further order. Elec. Order [Doc. No. 50].

Smith subsequently notified this court that the bankruptcy court granted him partial relief from the bankruptcy stay, permitting him to pursue his claims against Olund and Ragland in this action. Pl.'s Notice of Relief [Doc. No. 58]. On December 20, 2023, the court lifted the stay as to Defendants Olund and Ragland. See Elec. Order [Doc. No. 59]. The stay remains in effect as to Defendant Aphex. Id.

## II.     **Subject Matter Jurisdiction**

Subject matter jurisdiction concerns a court's power to hear a case. Unites States v. Cotton, 535 U.S. 625, 630 (2002). Rule 12(b)(1) is "[t]he proper vehicle for challenging a court's subject matter jurisdiction." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001).

Smith asserts that the court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Am. Compl. ¶ 5. District courts have original jurisdiction over civil actions arising between "citizens of different States" where the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1). "In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 553 (2005).

Smith alleges that he is a resident of Massachusetts, Aphex is a Nevada corporation with a principal place of business in New York, and Olund and Ragland are residents of Florida. Am. Compl. ¶¶ 1-4. [Doc. No. 4]. He alleges further that the amount in controversy is at least $157,609.[1] Id. ¶ 27. He also seeks costs and attorney fees, and treble damages under M. G. L. c. 149, § 150. Id. at 11. The pending motions raise no dispute as to the citizenship of any party or the amount in controversy.

Both Olund and Ragland nonetheless seek dismissal of Smith's Wage Act claims (Counts I and II of the Amended Complaint [Doc. No. 4]) pursuant to Fed. R. Civ. P. 12(b)(1). Olund MTD 7-9 [Doc. No. 8]; Ragland MTD 7-9 [Doc. No. 10]. They argue that the CSO Agreement lacks "any reflection of all parties to it to invoke the jurisdiction of Massachusetts courts" and there is no "express intent by the Massachusetts legislature . . . to give [the Wage Act claims] extraterritorial effect." Olund MTD 8 [Doc. No. 8]; Ragland MTD 8 [Doc. No. 10].

---

[1] The Amended Complaint alleges Aphex failed to pay Smith $121,341 in 2021 and $36,268 in January 2022, or $157,609 in total. In 2021, Aphex allegedly failed to pay Smith $48,439 in gross wages for his CSO position, $14,000 worth of health insurance for his CSO position, $15,000 for his Board position, and $43,902 for his CMO position (based on a reasonable compensation of $14,634 per month). Am. Compl. ¶¶ 19-24. In January 2022, Aphex allegedly failed to pay Smith $14,634 for his CSO position, $2,000 worth of health insurance for his CSO position, $14,634 for his CMO position, and $5,000 for his Board position. Id. ¶¶ 25-26.

Olund and Ragland cite <u>IMS Health Inc. v. Mills</u>, 616 F.3d 7, 26-27 (1st Cir. 2010), for the proposition that legislative intent is required to overcome a state's presumption that its statutes will not apply extraterritorially. <u>Id.</u> But extraterritoriality is related to a state's sovereign regulatory powers, which are not implicated in a 12(b)(1) inquiry as to the court's jurisdiction to hear the case. <u>See</u> <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247, 254 (2010) (holding that appeals court's treatment of extraterritorial reach as a question of 12(b)(1) subject matter jurisdiction was error).

In sum, the requirements of 28 U.S.C. § 1332(a) are met, and this court has subject matter jurisdiction over the dispute.

### III.     Personal Jurisdiction

A.  *Standard of Review*

The exercise of personal jurisdiction over a defendant must be authorized by statute and consistent with the due process requirements of the United States Constitution. <u>Nowak v. Tak How Inv., Ltd.</u>, 94 F.3d 708, 712 (1st Cir. 1996); <u>see also</u> <u>Barrett v. Lombardi</u>, 239 F.3d 23, 26 (1st Cir. 2001). When a defendant challenges personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction exists. <u>See</u> <u>Cossart v. United Excel Corp.</u>, 804 F.3d 13, 18 (1st Cir. 2015).

Where the court considers a Rule 12(b)(2) motion without holding an evidentiary hearing, the court applies the "prima facie standard." <u>See</u> <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1386 n.1 (1st Cir. 1995). To make a prima facie showing of jurisdiction, a plaintiff cannot rest on the pleadings but must "proffer[] evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." <u>Boit v. Gar-Tec Products, Inc.</u>, 967 F.2d 671, 675 (1st Cir. 1992). However, "the district court is not acting as a factfinder; rather, it accepts properly

supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law."
United Elec. Radio and Mach. Workers of America (UE) v. 163 Pleasant St. Corp., 987 F.2d 39,
44 (1st Cir. 1993).

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal
court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the
forum state." Cossart, 804 F.3d at 18 (quoting Sawtelle, 70 F.3d at 1387). Thus, to establish
personal jurisdiction over Olund or Ragland, Plaintiff "must meet the requirements of both the
Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment." Id.

    B.    *Jurisdictional Facts in the Record*

        1.    Creation of the CSO Agreement

Smith was appointed CSO pursuant to an agreement drafted by Aphex, reviewed by its
legal counsel, Robert J. Flynn, Jr., Esq., and signed by Aphex's thenPresident and CEO, David
Weaver. Per the agreement, Smith was to receive an annual salary of approximately $175,610
per year, or $14,634 per month, a family health insurance plan, and four weeks of vacation time.
Am. Compl. ¶¶ 8-9 [Doc. No. 4]; Ex. 2, CSO Agreement ¶¶ 3-5 [Doc. No. 4-2].

On or about June 9, 2021, Weaver executed the CSO Agreement with Smith. Aff. of
David Weaver ISO Sur-Reply in Opp. to Olund MTD ("Weaver Aff. ISO Sur-Reply Olund") ¶ 2
[Doc. No. 30-2]. The CSO Agreement was reviewed by Flynn as Aphex's general counsel and
was identical, except for the yearly salary and employee location, to the general employment
agreement used for every employee that was drafted in 2011 by an attorney at Weaver's request.
Id. ¶¶ 19-20. The CSO Agreement does not make "any suggestion, mention, or requirement that
[Smith] work from Massachusetts[,]" Olund Aff. ISO Reply 3 [Doc. No. 13-1], but was

"negotiated, partly drafted, and signed" in Massachusetts. Aff. of Scott Smith ISO Sur-Reply in Opp. to Olund MTD ("Smith Aff. ISO Sur-Reply Olund") ¶ 1 [Doc. No. 30-1].

Aphex employees work from home with few exceptions and at the time Smith was hired as CSO, Aphex understood he would be working primarily from his home in Massachusetts. Aff. of Scott Smith ISO Wage Act Violation Appl. ("Smith Aff. ISO Olund Appl.") ¶ 11 [Doc. No. 9-1]; Aff. of Scott Smith ISO Sur-Reply in Opp. to Ragland MTD ("Smith Aff. ISO Sur-Reply Ragland") ¶ 8 [Doc. No. 31-1]; Weaver Aff. ISO Sur-Reply Olund ¶¶ 5-12 [Doc. No. 30-2]. The nature of Smith's CSO position also included on-site visits and field work, including within Massachusetts. Smith Aff. ISO Sur-Reply Ragland ¶ 5 [Doc. No. 31-1].

      2.     Creation of the CMO Agreement and Board of Directors Agreement

On October 1, 2021, Olund agreed to employ Smith as Aphex's CMO and as a member of the Board. Smith Aff. ISO Olund Appl. ¶ 2 [Doc. No. 9-1]. Prior to that date, Olund was aware that Smith was working from his home in Massachusetts and doing business in Martha's Vineyard on Aphex's behalf. See id. ¶¶ 13-17.

      3.     Massachusetts Sales

Aphex is not licensed to do business in Massachusetts. Ragland Aff. ISO Reply ¶ 5 [Doc. No. 21-1]. Despite that, Olund directed Smith to go on a sales call in the state on one occasion, with arrangements made for Smith to meet with a CEO who lived and worked in Gloucester, Massachusetts. Smith Aff. ISO Sur-Reply Olund ¶ 7 [Doc. No. 30-1]. On another occasion, Olund emailed Smith to request he "pack and ship Aphex product samples" to a potential customer/business partner from his Massachusetts home, "where it was known to Olund that Aphex stored and shipped its inventory in and from Massachusetts[.]" Id. ¶ 13; see id., Ex. 2, Aug. 13 Email [Doc. No. 30-1].

Between July and September 2021, Smith promoted and demonstrated Aphex products to potential customers on Martha's Vineyard in Massachusetts. Smith Aff. ISO Olund Appl. ¶¶ 12, 14-16 [Doc. No. 9-1]. Smith sold two "totes" of Aphex Hy-IQ to the municipality of Tisbury to help the town's waste-water treatment problems in August 2021. Id. ¶ 17; see id., Ex. 4, Aug. 5 Email [Doc. No. 9-5]; Smith Aff. ISO Sur-Reply Olund ¶ 6 [Doc. No. 30-1]. Smith also visited Martha's Vineyard on various other occasions to pursue business opportunities for Aphex. Smith Aff. ISO Sur-Reply Olund ¶ 6 [Doc. No. 30-1].

Olund and Ragland both participated in video conferences and were included in email communications regarding Aphex's efforts to use Smith to solicit business from within Massachusetts in Martha's Vineyard. See Aff. of Scott Smith ISO Wage Act Violation Appl. Ragland ("Smith Aff. ISO Ragland Appl.") ¶¶ 13-17 [Doc. No. 11-1]; Smith Aff. ISO Olund Appl. ¶¶ 13-17 [Doc. No. 9-1]; see also Smith Aff. ISO Olund Appl., Ex. 1, July 9-10 Emails [Doc. No. 9-2]; Ex. 2, July 13 Email [Doc. No. 9-3]; Ex. 3, Sept. 16 Email [Doc. No. 9-4]; Ex. 4, Aug. 5 Email [Doc. No. 9-5]. Neither Olund nor Ragland (nor any other Aphex Board Member, executive, or employee) ever traveled to Massachusetts to meet with Smith. Ragland Aff. ¶ 7 [Doc. No. 21-1].

Smith submitted receipts and expense reports to Ragland for expenditures incurred for and related to his employment with Aphex, including for travel and lodging, as well as costs pertaining to his work in Martha's Vineyard. Smith Aff. ISO Ragland Appl. ¶¶ 18-19 [Doc. No. 11-1]. Ragland reimbursed Smith for expenses related to his in-state activity. Id. ¶ 13; Id. Ex. 5, July Reimbursement Emails [Doc. No. 11-1].

4.      Smith's Termination

On February 27, 2022, Olund sent Smith a notice of a special board meeting to be held via conference call to vote on terminating Smith as a board member, citing this suit as a basis. Smith Aff. ISO Sur-Reply Olund ¶ 14 [Doc. No. 30-1]; id., Ex. 3, Feb. 27 Email [Doc. No. 30-1]. In March 2022, Olund and Ragland both attended the special board meeting held by conference call and voted in favor of Smith's termination. Id. ¶¶ 15-16; Smith Aff. ISO Sur-Reply Ragland ¶¶ 15-16 [Doc. No. 31-1]. Smith attended the conference call from Massachusetts. Id. ¶ 15. On March 3, 2022, the board meeting was reconvened, and Olund and Ragland voted in favor of Smith's termination. Id. ¶ 16. Smith was in Massachusetts when he was notified of the termination by phone conference. Id.

C.      *Discussion*

Olund and Ragland argue that their contacts with Massachusetts do not satisfy the requirements of either the state long-arm statute or constitutional due process, and, as such, this court lacks personal jurisdiction over them. Olund MTD 6-7 [Doc. No. 8]; and Ragland MTD 6-7 [Doc. No. 10].

1.      Massachusetts Long-Arm Statute

"The jurisdictional requirements imposed by the Massachusetts long-arm statute are quite similar to, though not completely congruent with, the jurisdictional requirements imposed by the Due Process Clause." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016) (citation omitted). Even where a party presents "jurisdictional facts sufficient to survive due process scrutiny, a judge would be required to decline to exercise jurisdiction if the plaintiff was unable to satisfy at least one of the statutory prerequisites." Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 6, 389 N.E.2d 76, 80 (1979).

The Massachusetts long-arm statute provides as follows:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the persons (a) transacting any business in this commonwealth; (b) contracting to supply services or things in this commonwealth; (c) causing tortious injury by an act or omission in this commonwealth; (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth; (e) having an interest in, using or possessing real property in this commonwealth . . . .

M. G. L. c. 223A, § 3.

Olund and Ragland assert they have not transacted business, contracted to supply services or things, committed a tortious act or omission, or caused tortious injury in Massachusetts as required by M. G. L. c. 223A, § 3. Olund MTD 6-7 [Doc. No. 8]; Ragland MTD 6-7 [Doc. No. 10]. Plaintiff's primary argument is that both Defendants satisfy the requirements of § 3(a) based on Smith's solicitation of business within the Commonwealth on Aphex's behalf. Pl.'s Opp. Olund 7 [Doc. No. 9]; Pl.'s Opp. Ragland 7 [Doc. No. 11].[2]

When construing § 3(a), "transacting business" must be interpreted "in a generous manner" with a focus on "whether the defendant[s] attempted to participate in the commonwealth's economic life." Cossart, 804 F.3d at 18 (citing United Elec., 960 F.2d at 1087). Additionally, in determining whether a claim arises from the defendant transacting business in the state, the court looks to whether the business transacted was a "but for" cause of the alleged harm. Id.; Tatro v. Manor Care, Inc., 416 Mass. 763, 771-2, 625 N.E.2d 549, 554 (1994). The

---

[2] Plaintiff also claims Olund and Ragland are subject to this court's personal jurisdiction based on M. G. L. 223A, § 3(c)-(e). Pl.'s Sur-Reply Olund 11-12 [Doc. No. 30]; Pl.'s Sur-Reply Ragland 11-12 [Doc. No. 31]. Plaintiff's additional arguments need not be reached. Olund is subject to personal jurisdiction in this court under § 3(a) of the long arm statute, as discussed infra Section III.C.1.a, and Ragland's individual actions are limited and therefore insufficient to establish jurisdiction under § 3(c)-(e) of the long-arm statute, as discussed infra Section III.C.1.b.

Massachusetts Supreme Judicial Court has exercised jurisdiction pursuant to § 3(a) where a defendant has "purposeful[ly] and successful[ly] solicit[ed] business from residents of the Commonwealth." Tatro, 416 Mass. at 767.

Smith alleges that during his time employed as Aphex's CSO he successfully solicited business from the Town of Tisbury, Massachusetts, on Martha's Vineyard. Pl.'s Olund Opp. 7 [Doc. No. 9]. After promoting and demonstrating Aphex's Hy-IQ and Hy-IQ BioFoam products to potential customers, Smith sold two "totes" of Hy-IQ to a wastewater plant in Tisbury on or around August 5, 2021. Smith Aff. ISO Olund Appl. ¶¶ 12, 15, 17 [Doc. No. 9-1]. Neither Defendant disputes that this sale occurred; rather, they assert that Smith was not contractually required, and was in fact not expected to work from Massachusetts, and that going to Martha's Vineyard was his own choice. Olund Reply 3 [Doc. No. 13]; Ragland Aff. ISO Reply ¶ 4 [Doc. No. 21-1]. Neither Defendant offers evidence indicating Smith was asked to stop doing business in Martha's Vineyard or informed that Aphex was not licensed to do business in Massachusetts. To the contrary, Smith provides evidence that his Martha's Vineyard trips were sanctioned by Aphex's then-CEO Weaver. Weaver Aff. ISO Sur-Reply Olund ¶ 13 [Doc. No. 30-2]. And the responses to Smith's Martha's Vineyard update emails were positive: "Great Job Scott!!!" and "Great Job! Thanks" among them. Pl.'s Olund Opp., Ex. 1, July 9-10 Emails [Doc. No. 9-2]; id., Ex. 4, Aug. 5 Email [Doc. No. 9-5].

By showing Aphex solicited business in Massachusetts, Plaintiff has met the requirements of establishing personal jurisdiction over Aphex itself under § 3(a). Smith contends that the court also has personal jurisdiction over Olund and Ragland, who Smith has sued as

"employers" as defined by the Massachusetts Wage Act.[3] Specifically, Smith contends that, as

his employers, the individual Defendants transacted business within the Commonwealth putting

them both within reach of § 3(a) of the Massachusetts long-arm statute. Pl.'s Olund Opp. 6 [Doc.

No. 9]; Pl.'s Ragland Opp. 6 [Doc. No. 11]; M. G. L. c. 223A, § 3(a).

However, under the Massachusetts long-arm statute, jurisdiction over a corporate officer

cannot be based solely on jurisdiction over the corporation itself. Johnson Creative Arts, Inc. v.

Wool Masters, Inc., 573 F. Supp. 1106, 1111 (D. Mass. 1983). There must be an "independent

basis" for a court in Massachusetts to exercise jurisdiction over the individual. LaVallee v.

Parrot-Ice Drink Prod. Of Am., Inc., 193 F. Supp. 2d 296, 300 (D. Mass. 2002) (citation

omitted). For this inquiry, Defendants Olund and Ragland should be judged according to whether

they were "primary participants in [the] alleged wrongdoing[.]" Calder v. Jones, 465 U.S. 783,

790 (1984). The court considers its jurisdiction under the long-arm statute over each individual

Defendant.

     a.  Olund

With respect to Olund, Smith alleges that in October 2021 (after Olund had become the

CEO), Smith was employed as the CMO and a board member of Aphex, and that Olund made a

"verbal promise" that Smith would receive a salary and compensation for these positions, the

nonpayment of which is part of the basis for this action and occurred in Massachusetts. Am.

Compl. ¶¶ 10, 13. Smith alleges that, in employing a Massachusetts resident, Olund understood

Smith would be working primarily from his home and soliciting business from within the state.

Pl.'s Olund Opp. 7 [Doc. No. 9]. This understanding is supported by Smith's allegations that in

---

[3] "The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the corporation within the meaning of this section." M. G. L. c. 149, § 148.

August 2021, prior to employing Smith as CMO and Board member, Olund directed him to pack and ship Aphex products from his Massachusetts home. Smith Aff. ISO Sur-Reply Olund ¶ 13 [Doc. No. 30-1]. Furthermore, Smith argues that between November and December 2021, Olund directed him to go on a sales call within Massachusetts, though it is not clear whether the meeting took place. Id. ¶ 7.

The circumstances surrounding Smith's engagement as CMO and Board member at Aphex are disputed. According to Olund, to rectify the allegedly void CSO Agreement, the parties negotiated a valid contract in the fall of 2021 via Zoom. Flynn Aff. ISO Olund MTD ¶ 4 [Doc. No. 8-6]. However, Smith did not sign the contract that was presented to him during the meeting and "demanded payment for his 'past due services'" before signing. Id. ¶¶ 4-5. Smith asserts that he was employed as CMO and Board member on October 1, 2021, and that in November 2021, Aphex sought to purchase another of Smith's patents and "update and broaden his written employment contract." Am. Compl. ¶¶ 10, 13, 57 [Doc. No. 4]. On various days that month, Smith, through his counsel, Brian J. Wasser ("Wasser"), wrote to Aphex, Olund, and Fitzgerald demanding they bring his past due employment up to date. Id. ¶ 56. However his appointment transpired, it is undisputed that Smith was Aphex's CMO as of November 4, 2021. Id. ¶¶ 70-71.

Olund asserts that the CSO Agreement was never a valid contract and that, regardless, it did not require Smith to work from Massachusetts. Olund MTD 2 [Doc. No. 8]; Olund Reply 3-4 [Doc. No. 13]. Instead, Smith chose to travel to Martha's Vineyard "sua sponte" and not at Olund or Aphex's direction. Olund Reply 3 [Doc. No. 13]. These arguments do not negate Smith's allegations about Olund's participation in his employment as CMO, and Olund does not

deny those allegations nor Smith's allegation that Olund directed him to go on a sales call within Massachusetts.

Courts considering personal jurisdiction over individual corporate officers in Wage Act cases have found exercising personal jurisdiction appropriate where plaintiffs have alleged facts similar to those alleged by Smith as to Olund. Compare Cossart, 804 F.3d at 17-19 (finding defendant corporation's president to be a primary participant in a Wage Act action where he "personally negotiated the employment contract that contemplated that this employee would work out of Massachusetts" and fired the plaintiff after refusing to pay him a certain commission) and Levesque v. Schroder Invest. Mgmt. N. Am., Inc., 368 F. Supp. 3d 302, 308 (D. Mass. 2019) (finding personal jurisdiction over defendant-CEO where he was a primary participant in corporate activities and transacted business within the state) and Post v. Mark Edward Partners, LLC, 2022 WL 5118214, at *2 (D. Mass. Oct. 3, 2022) (finding the long-arm statute was satisfied and individual corporate defendants transacted business in the commonwealth where they personally recruited plaintiff to establish a presence in the state, personally negotiated employment terms, and directly supervised plaintiff's work in the state) with Perras v. Trane U.S., Inc., 463 F. Supp. 38, 42, 43 (D. Mass. 2020) ("Plaintiff asserts that by virtue of their roles as high-ranking executives and because the Wage Act states that corporate officers may be individually liable for violations, the individual defendants satisfy the long-arm statute. . . . Plaintiff fails to allege any facts to show that either [President or Treasurer] participated at all in the alleged failure to pay [Plaintiff's] commissions.") and King v. Prodea Sys. Inc., 433 F. Supp. 3d 7, 16 (D. Mass. 2019) (finding no personal jurisdiction over individual corporate officers where plaintiff failed to allege facts or proffer evidence that defendants

personally benefitted from or acted outside the scope of their employment in withholding wages).

Accordingly, this court finds that the facts and evidence proffered by Smith as to Olund's individual actions in connection with his employment satisfy the long-arm statute.

### b. Ragland

Smith does not allege that Ragland participated in his employment as CSO, CMO, or a board member. The only allegation Smith makes as to the alleged wrongdoing is that Ragland was present at the special board meeting in March 2022 and that he voted in favor of terminating Smith's position on the Board. Smith Aff. ISO Sur-Reply Ragland ¶¶ 15-16 [Doc. No. 31-1]. While this evidence may support Smith's Massachusetts Wage Act retaliation claim in another forum, it does not allow for a finding that Ragland was a primary participant in the alleged Wage Act violation for purposes of personal jurisdiction. Accordingly, Defendant Ragland's Motion to Dismiss [Doc. No. 10] pursuant to Fed. R. Civ. P. 12(b)(2) is granted.

### 2. Due Process

Because the court has determined that Ragland should be dismissed because he is not reached by the long-arm statute, the court considers due process only as to Defendant Olund.

The due process inquiry requires that there be "minimum contacts" between the defendant and the forum state. Sawtelle, 70 F.3d at 1388 (quoting Int'l Shoe Co. v. State of Wash., 326 U.S. 310, 316 (1945)). Thus, a court may exercise general jurisdiction over "a defendant who has maintained a continuous and systematic linkage with the forum state," and may exercise specific jurisdiction over a cause of action that "relates sufficiently to, or arises from" the defendant's forum-state contacts. Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 288 (1st Cir. 1999).

Olund argues he does not have sufficient "minimum contacts" with Massachusetts to justify personal jurisdiction. Olund MTD 6 [Doc. No. 8]. Where, as here, a defendant is neither domiciled in nor has "substantial[,]" "continuous and systematic" contacts with Massachusetts, general jurisdiction is not sufficient to hail them into the forum. Pettengill v. Curtis, 584 F. Supp. 2d 348, 357 (D. Mass. 2008) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984)).

Smith contends that Olund is subject to the specific jurisdiction of this court based on various events involving his contact with Massachusetts, including: (1) breach of the CSO Agreement; (2) Smith's work responsibilities being carried out from his home in Massachusetts; and (3) Smith's demands for payment and Defendants' refusal to pay. Pl.'s Olund Opp. 8-9 [Doc. No. 9]; Pl.'s Ragland Opp. 8-9 [Doc. No. 11]. "'Specific personal jurisdiction . . . may only be relied upon where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" Warren Env't, Inc. v. Source One Env't, Ltd., 2020 WL 1974256, at *3 (D. Mass. Apr. 24, 2020) (quoting Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994) (other citation omitted)). "The three elements of specific jurisdiction are relatedness (the nexus of plaintiff's claim with the defendant's contact with the forum), purposeful availment (something more than an isolated contact or the unilateral activity of a third person), and the reasonableness of the exercise of jurisdiction (the five Gestalt factors)." Id. (citing Baskin-Robbins, 825 F.3d at 35); C.W. Downer & Co. v. Bioriginal Food & Science Corp., 771 F.3d 59, 65 (1st Cir. 2014).

   a.   Relatedness

Relatedness requires the plaintiff show "a demonstrable nexus between [its] claims and [the defendant's] forum-based activities, such . . . [that] the litigation itself is founded directly on those activities." C.W. Downer, 771 F.3d at 66 (quoting Adelson v. Hananel, 652 F.3d 75, 81

(1st Cir. 2011)). The test is a "flexible, relaxed standard." Adelson, 652 F.3d at 81 (internal citation omitted). In cases related to contract disputes, special attention should be given to "the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." C.W. Downer, 771 F.3d at 66 (internal quotations omitted). "We conduct this analysis with reference to the contacts the defendant creates with the forum state, though those contacts may be 'intertwined' with the activities of the plaintiff." Id. (quoting Walden v. Fiore, 134 S. Ct. 1115, 1122–23 (2014)).

In Cossart, the First Circuit found relatedness between the plaintiff's Wage Act claim and the forum where the lawsuit arose out of an alleged breach of a contract "defendants procured with a Massachusetts resident to be performed by the resident primarily from Massachusetts." 804 F.3d at 20. The relatedness holding was bolstered by the fact that the plaintiff performed a "substantial portion of the work" underpinning the Wage Act violation from Massachusetts, including "sending e-mails and making phone calls[,]" and "acting within the scope of his employment[.]" Id. at 20-21. Similarly, in C.W. Downer, that defendant had an "ongoing connection with Massachusetts in the performance under the contract[,]" was enough to find relatedness. 771 F.3d at 66. Here, Smith has met his burden of showing relatedness between Olund's forum-based activities and the underlying breach of contract and Wage Act violations.

Olund, according to Smith, "participated in video conference meetings discussing the company's efforts to use [Smith] to procure business from the Town of Tisbury, MA," and was also included in email chains related to the same. Smith Aff. ISO Olund Appl. ¶ 13 [Doc. No. 9-1]. Although Olund argues there was no contractual expectation that Smith work from his Massachusetts home, Smith has offered evidence, which the court must credit at this stage, that Olund knew, or at minimum should have known, that Smith was soliciting business from within

17

the Commonwealth in carrying out his duties under the CSO Agreement. For instance, Olund not only made plans to have Smith meet with a potential customer/business partner in Massachusetts, but also emailed Smith on at least one occasion to pack and ship product samples from his Massachusetts home. Smith Aff. ISO Sur-Reply Olund ¶¶ 7, 13, Ex. 2, Aug. 13 Email [Doc. No. 30-1]. And Olund, after he became Aphex's President, hired Smith as CMO and a board member on October 1, 2021, at which time he was aware Smith was operating out of his home in Massachusetts. Am. Compl. ¶¶ 10, 13 [Doc. No. 4]; Smith Aff. ISO Olund Sur-Reply, Ex. 2, Aug. 13 Email [Doc. No. 30-1].

Based on the above, there is a demonstrable nexus between Olund's contacts with Massachusetts, though those contacts are intertwined with Smith's own activities, and the claims in the Amended Complaint [Doc. No. 4].

b.   Purposeful Availment

"The purposeful availment prong 'represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior.'" C.W. Downer, 771 F.3d at 66 (quoting Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011). Voluntariness and foreseeability are crucial to the analysis, placing emphasis on defendant's intentions and prohibiting jurisdiction based on "random, fortuitous, or attenuated contacts." Id. (citing Daynard v. Ness Motley, Loadholt, Richardson, & Poole, P.A., 290 F.3d 42, 61 (1st Cir. 2002)) (quoting Carreras, 660 F.3d at 555) (internal quotation omitted). Courts have found defendants to have purposefully availed themselves of a forum where they (1) voluntarily solicited of services from within the forum; (2) formed a contractual relationship with a party

reasonably known to be in the forum; and (3) there was performance under the contract by the in-state party. Id.; Cossart, 804 F.3d at 21-22.

Here all three factors recognized in C.W. Downer and Cossart are present. Although the CSO Agreement did not specifically contemplate that Smith would work within Massachusetts, based on the evidence put forward by Smith, it was reasonably known to Olund that Smith resided there when he was employed as CMO and a Board member. See supra Section III.B.2. It was also foreseeable that the majority of Smith's work for Aphex would be rendered in the Commonwealth. Id. What's more, Olund "voluntarily facilitated [Smith's] work from Massachusetts[,]" by planning to send him on sales calls within the state and using his home "as a packing and shipping facility." Cossart, 804 F.3d at 21; Smith Aff. ISO Sur-Reply Olund ¶¶ 7, 9 [Doc. No. 30-1]. Olund also provided Smith with product inventory, supplies, and equipment to operate Aphex business from his home. Pl.'s Sur-Reply in Opp. to Olund's Reply ("Pl.'s Sur-Reply Olund") ¶ 9 [Doc. No. 30]. As such, Olund purposely availed himself of Massachusetts.

c. Reasonableness

Olund has satisfied the first two prongs of the Due Process analysis, but the court must still ensure that exercising jurisdiction over him is fair and reasonable. In doing so, the court considers the "gestalt" factors: "(1) the defendant[s'] burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." Cossart, 804 F.3d at 22 (quoting C.W. Downer, 771 F.3d at 69). "Where the minimum contacts question is very close[,]" these factors play a larger role and the less a defendant needs to show as to unreasonableness. Adelson v. Hananel, 510 F.3d 43, 51 (1st

Cir. 2007); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994). Weighing

the factors favors jurisdiction.

Here, Olund has not made any showing that appearing in Massachusetts court subjects

him to any "special or unusual burden." Bluetarp Fin., Inc. v. Matrix Constr. Co., Inc., 709 F.3d

72, 83 (1st Cir. 2013) (internal citations omitted). Olund instead points out that "Smith is found

resident within the jurisdiction of the … District of Massachusetts. All other Defendants,

however, are not." Olund MTD 11 [Doc. No. 8]. This is not enough to show a burden under the

"gestalt" factors. "Mounting an out-of-state defense most always means added trouble and cost

and therefore this factor is only meaningful where a party can demonstrate some kind of special

or unusual burden." Bluetarp Fin., Inc. 709 F.3d at 83 (internal quotations omitted); see Cossart,

804 F.3d at 22 (finding "neither defendant has shown that 'some kind of special or unusual

burden' would result from Massachusetts serving as the forum" where the defendants were

Kansas-based).

Massachusetts also has an interest in adjudicating the dispute, as Smith's civil action is

predicated on violations of the state's Wage Act. C.f. C.W. Downer, 771 F.3d at 70

("Massachusetts has significant interests in providing a convenient forum for disputes involving

its citizens and in ensuring that its companies have easy access to a forum when their commercial

contracts are said to be breached by out-of-state defendants.") (citations omitted). Consequently,

exercising personal jurisdiction over Olund does not offend the Due Process Clause of the

Constitution.

## IV.   Venue

Venue refers to the place where a lawsuit should be brought. Under 28 U.S.C. § 1391(b)

venue is appropriate in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). If the case does not fall into one of these categories, "venue is improper, and the case must be dismissed or transferred under § 1406(a)." Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S 49, 56 (2013). In general, "the purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place for trial." Leroy v. Great Western United Corp., 443 U.S. 173, 183–84 (1979) (emphasis in original).

In determining venue, the court looks "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001) (internal citation omitted). This is a "holistic view of the acts underlying a claim." Id. at 42 n.6.

Olund argues that Massachusetts is an improper venue for this action and ask the court to dismiss pursuant to Fed. R. Civ. P. 12(b)(3). Olund MTD 10-11 [Doc. No. 8].[4] According to Olund's Motion to Dismiss, the requirements of 28 U.S.C. § 1391 are not met because: (1) Olund and Ragland are both residents of Florida; (2) there is no allegation in the Complaint that "a

---

[4] Ragland also moved to dismiss for improper venue, Ragland MTD 10-11 [Doc. No. 10], but because the court has determined that he should be dismissed for lack of personal jurisdiction, the court does not address Ragland and Smith's briefing as to Ragland's venue argument.

substantial part of the events or omissions giving rise to the claim occurred" in Massachusetts; and (3) this court does not have personal jurisdiction over either Defendant. Id.

Smith contends that venue is proper under 28 U.S.C. § 1391(b)(2), pointing to various events that occurred in Massachusetts which gave rise to the Wage Act claims, including: (1) negotiation and partial drafting of the CSO Agreement terms; (2) Aphex's employment of a Massachusetts resident with the intent that he solicit business in the state; and (3) the failure to pay Smith his earned wages and benefits. Pl.'s Olund Opp. 16 [Doc. No. 9]. Smith also asserts that venue is proper under § 1391(b)(3) because Olund is subject to personal jurisdiction in this juridical district. Id. at 16-17.

Venue is proper in a judicial district where a "substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b). The First Circuit takes a holistic view of acts underlying a claim when considering "events or omissions" for venue purposes. Uffner, 244 F.3d at 42 n.6. Here, the alleged acts considered in relation to Smith's Wage Act claims are: (1) Smith entered a contract (the CSO Agreement) and was employed by Aphex, with agreed upon salary, reimbursement, and benefits; (2) Smith was employed as CMO and board member of Aphex and was verbally promised he would be compensated; (3) Smith performed work as the CSO, CMO, and board member of Aphex; (4) Smith incurred reimbursable expenses in the course of his work for Aphex; (5) Aphex failed to pay Smith the agreed upon salary, compensation, benefits, and reimbursements; (6) Smith filed a complaint with the AGO and received written authorization to bring suit; and (7) Aphex commenced a "Smear Campaign" against Smith for his complaint to the AGO and filing this action. Am. Compl. ¶¶ 8-40. This sequence of events compels the conclusion that venue is proper in Massachusetts.

As detailed above, Smith negotiated, partially drafted, and signed the CSO Agreement from Massachusetts. Smith Aff. ISO Sur-Reply Olund ¶ 1 [Doc. No. 30-1]. In carrying out his work as CSO, CMO, and board member of Aphex, Smith participated in meetings via telephone and video call from his home in Massachusetts. Pl.'s Olund Opp. ¶ 11 [Doc. No 9]. Smith performed a significant portion of his duties in Massachusetts, including soliciting business in Tisbury, Massachusetts. Smith Aff. ISO Sur-Reply Olund ¶¶ 4-5 [Doc. No. 30-1]. What payments were made to Smith were made into Massachusetts. Weaver Aff. ISO Sur-Reply Olund ¶¶ 4-5 [Doc. No. 30-2]. These facts, among others, are "substantial" and make venue in Massachusetts proper. See Art Tech. Grp., Inc. V. Puritan's Pride, Inc., 716 F. Supp. 2d 93, 105 (D. Mass. 2010) (finding venue proper in Massachusetts in a breach of contract case based on contract negotiations, significant performance of duties, extensive discussions, payments, and contract termination within the state).

Accordingly, to the extent that Defendant Olund's motion seeks to dismiss for improper venue, it is denied.

## V.    Conclusion

For the foregoing reasons, Olund's Motion to Dismiss [Doc. No. 8] for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue is DENIED and Ragland's Motion to Dismiss [Doc. No. 10] is GRANTED for lack of personal jurisdiction.


IT IS SO ORDERED.

April 10, 2024                                    /s/Indira Talwani
                                                  United States District Judge